**Affirmed and Memorandum Opinion filed November 10, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00489-CV

## IN THE INTEREST OF O.D.H., A CHILD

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-05226J**

## NO. 14-15-00492-CV

## IN THE INTEREST OF X.F.H., Z.T.A.A. AND J.D.K., CHILDREN

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-05963J**

# MEMORANDUM OPINION

F.J.K.H. (Mother) appeals two final decrees terminating her parental rights with respect to her four children: (1) one regarding her oldest son, Oscar,[1] and (2) one regarding her three other sons, Xavier, Zachary, and Jack. The boys' fathers, whose parental rights were also terminated, do not appeal. Mother raises three issues in each appeal concerning the legal and factual sufficiency of the evidence to support the trial court's findings that termination was proper under section 161.001(1)(E) and (O) of the Texas Family Code[2] and that termination is in the boys' best interest. We affirm.

## BACKGROUND

Mother has four children by three fathers: Oscar, born in January 2000; Xavier, born in December 2001; Zachary, born in August 2008; and Jack, born in May 2010. She has a long history with the Texas Department of Protective and Family Services (the Department), beginning in February 2002.

The events underlying these cases began in May 2010, the day after Jack was born. The Department received a referral alleging Mother's neglectful supervision of Jack due to her testing positive for marijuana and cocaine a few weeks earlier. In March 2011, because Mother was not following her family services plan and the children were in immediate danger, the Department took custody of the four boys in cause number 2011-02872J (the First Case).

The First Case was dismissed on October 22, 2012, because one of the fathers was not timely served. The next day, the Department filed the two suits

---

[1] We use fictitious names to refer to the children discussed in this opinion. *See* Tex. R. App. P. 9.8(b)(2).

[2] The numbering of section 161.001 changed effective September 1, 2015. Section 161.001(1) is now section 161.001(b)(1). Act of June 18, 2015, 84th Leg., R.S., ch. 944, § 11, 2015 Tex. Sess. Law. Serv. 3271 (West) (codified at Tex. Fam. Code Ann. § 161.001(b)(1)). Mother's case is governed by the preceding version, effective January 1, 2011. We refer to the 2011 version in this opinion.

underlying these appeals: one concerning Oscar (cause number 2012-05226J), and one concerning Xavier, Zachary, and Jack (cause number 2012-05963J).

The record reflects that the Department's primary concerns in these cases were Mother's continued substance abuse and her untreated mental illness. She tested positive for drugs on several occasions throughout the First Case and these cases. Per a court order, she was admitted for inpatient rehabilitation services. She was discharged after successfully completing the program, but she tested positive for drug use after discharge. Mother was also diagnosed with bipolar disorder with grandiose delusions. She was prescribed medication, but she did not always take it.

Trial began in April 2014, resumed in March 2015, and concluded in May 2015. The Department sought termination of Mother's parental rights under subsections E (endangerment of the children) and O (failure to comply with the court-ordered family service plan) of section 161.001 of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(1) (West 2014). Following closing arguments, the trial court announced on the record its findings that termination was warranted under both subsections E and O. The court also found termination of Mother's and the fathers' parental rights was in the children's best interest. *Id.* § 161.001(2). The court signed the final decree of termination on May 11, 2015, memorializing its oral findings and appointing the Department as the children's sole managing conservator. Mother timely appealed.

**BURDEN OF PROOF AND STANDARDS OF REVIEW**

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not

absolute. The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d at 358.

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act described in section 161.001(1) of the Texas Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001. Only one predicate finding under section 161.001(1) is necessary to support a decree of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

4

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

If disposition of an issue would result in a rendition of judgment, an appellate court should consider that issue before addressing any issues that would result only in a remand for a new trial. *See Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003); *In re S.R.*, 452 S.W.3d at 359 (applying rule in parental termination appeal and first addressing legal sufficiency challenges). Accordingly, we first consider the challenges to the legal sufficiency of the evidence, followed by a review for factual sufficiency.

## PREDICATE TERMINATION GROUND: ENDANGERMENT

### Legal Standards

Termination is warranted if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(E). To support a finding under

5

subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re S.R.*, 452 S.W.3d at 360; *In re J.T.G.*, 121 S.W.3d at 125. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). Also, a court may consider conduct both before and after the Department removed the child from the home. *See In re S.R.*, 452 S.W.3d at 360-62 (considering persistence of endangering conduct up to time of trial); *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (same).

Although endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from a parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re S.R.*, 452 S.W.3d at 360. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re S.R.*, 452 S.W.3d at 360.

**Analysis**

1.    **Substance abuse**

A parent's drug use can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See In re S.R.*, 452 S.W.3d at 361; *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Continued illegal drug use after a child's removal is conduct that

6

jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *In re S.R.*, 452 S.W.3d at 361–62; *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.— Houston [1st Dist.] 2006, no pet.) (en banc).

***Early drug use.*** Mother began experimenting with marijuana when she was 12. She started using both cocaine and phencyclidine (PCP) in 2003, at age 16 or 17.[3] Oscar and Xavier were toddlers at that time. Mother reported she was addicted to cocaine by age 22. She admitted to smoking marijuana daily.

***Drug use during the First Case.*** Mother tested positive for marijuana and cocaine near the end of her pregnancy with Jack in May 2010; those results led to the Department filing the First Case. She testified that she used drugs throughout the time her children were in the Department's custody during the First Case. Certain instances of that usage are identified in the record:

- August 2010: smoked marijuana with her mother's paramour
- September 2010: admitted she would test positive for PCP
- December 2010: used cocaine on New Year's Eve
- February 2011: smoked marijuana
- May 2011: positive for cocaine
- March 2012: positive for hydrocodone, opiates, and cocaine
- Failed to submit to 10 out of 18 requested urine drug screenings; did not submit to any between April 2012 and June 2012, even though she was called six times during that period.

When asked why she was using drugs while her children were in the Department's custody, Mother said:

---

[3] Elsewhere in the record, Mother is said to have first taken PCP at age 23.

Because I was really stressing behind everything that I was going through with CPS. I mean, people say it's easy to just stop doing drugs. That's easy said as done. That's only people who hasn't [sic] been exposed to using drugs before. But not only that, going through a trauma being separated from the children; that hurts, you know what I'm saying? Those are some things that people use to suppress some of that pressure, that pain, that hurt. And at that point in time, I was using it to cope.

***Drug use during these cases before inpatient drug rehabilitation.*** At a December 12, 2012 status hearing, shortly after these cases began, the Department filed a family service plan for Mother. According to the plan, Mother "continue[d] to refuse taking random urinalysis." She also was said to have taken drugs in front of her children during unapproved contact with them. The service plan required her to submit to random urinalysis on a few hours' notice, participate fully in a drug and alcohol assessment and follow the assessor's recommendations, and attend Narcotics Anonymous meetings.

Later that afternoon, Mother submitted to a drug test. She tested positive for cocaine, marijuana, and PCP.

The next status hearing was held in mid-February 2013. At the conclusion of that hearing, the trial court ordered Mother to submit to at least four urinalyses per month, administered at random times; to attend 90 Narcotics Anonymous meetings in 90 days; and to apply for Mental Health Mental Retardation services for medication and therapy. The court also ordered Mother to remain in the courtroom for a urine drug screen and hair follicle drug screen. The record does not contain the results of those tests.

Near the end of March, Mother was arrested and charged with DUI. Her blood alcohol content level was alleged to be .08. She later pleaded guilty to that charge and was sentenced to 20 days' confinement in county jail.

***Drug use during inpatient drug rehabilitation.*** In mid-April, the trial court ordered Mother to undergo inpatient drug rehabilitation. She began to do so on June 18, when she was admitted to Santa Maria Hostel, a drug treatment facility. On her intake form, she wrote that the last date she used "alcohol or other drugs" was February 22, 2013. However, on June 17, the day before she was admitted, she submitted to a drug and alcohol screen that later revealed a positive result for alcohol.[4] Also, she had been arrested for drunk driving on March 27.

Mother testified that while she was an inpatient at Santa Maria, she went out with friends for dinner at a Mexican restaurant one evening and had "a few margaritas." The Santa Maria records also report that after a doctor's appointment in late July, Mother went to a pool house and drank a shot of vodka.

Mother was discharged from Santa Maria on August 28. Her discharge papers indicate she successfully completed the program. "Successful completion" of the Santa Maria program means Mother completed at least 70 percent of her treatment plan requirements.

***Drug use after inpatient drug rehabilitation.*** Mother's drug use was more sporadic following her discharge from Santa Maria:

- October 2013: positive for alcohol

_____

[4] On that day, Mother's levels were 69,800 ng/mL for ethyl glucuronide and 17,800 ng/mL for ethyl sulfate, both alcohol metabolites. Several months later, in October, Mother's levels were much lower—2,480 ng/mL for ethyl glucuronide and 1,360 ng/mL for ethyl sulfate—but still sufficient to yield a positive result.

Bruce Jefferies owns the companies that performed Mother's drug and alcohol assessments. He is qualified to interpret the results of a hair follicle drug test and a urinalysis drug test. He testified about the October 2013 test. He said it would pick up alcohol ingestion for the past 80 hours. He explained that her level of 2,480 ng/mL could have resulted from a glass of wine the day before the test, or from larger volumes two or three days before the test.

Because levels of 2,480 ng/mL and 1,360 ng/mL were enough for Mother to test positive for alcohol in October, we can reasonably infer from her levels of 69,800 ng/mL and 17,800 ng/mL that Mother had consumed a large amount of alcohol before the June test.

- January 2014: negative for all tested substances

- March 2014: negative for all tested substances

- June 2014: positive for cocaine

- July 2014: positive for cocaine (possibly residual)

- August 2014: positive for cocaine

- March – April 2015: failed to comply with five requests for urinalysis

According to Mother, she did not introduce cocaine into her body in June or July of 2014. She said during that time she would spend the mornings at the house of some friends who were using cocaine. She surmised her exposure to cocaine led to the positive test results.

***Spending time with drug users.*** Mother was at the scene of a fatal shooting in April 2012. The shooting was believed to be drug-related. Nothing in the record indicates she was criminally responsible for the shooting. The Department was concerned, though, because Mother's presence at the scene implied she was associating with people buying or selling drugs.

As noted above, during the summer of 2014, Mother spent a few hours on some mornings at a house where a friend lived with another person. She had known them for about three months at the time. She did not know either person's last name. Mother said that although she did not see them using cocaine, she knew they were using it, because she is "not stupid."

### 2.    Untreated mental illness

Mental illness alone is not grounds for terminating the parent-child relationship. *In re S.R.,* 452 S.W.3d at 363. Untreated mental illness can expose a child to endangerment, however, and is a factor the court may consider. *Id.*; *see In*

*re L.L.F.*, No. 02–11–00485–CV, 2012 WL 2923291, *15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (considering parent's failure to take medication to treat mental health issues as factor in creating environment that endangers child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering parent's mental health and noncompliance with medication schedule as factors in endangering child).

Mother has been diagnosed with bipolar disorder, antisocial personality disorder, and, by self-report, adjustment disorder. She was prescribed Invega in January 2011 for daily use in managing her bipolar disorder. The record does not indicate whether she took the medication as directed. While talking to a Department caseworker in October 2011, however, Mother denied her diagnosis of bipolar disorder. She said the previous caseworker "planted" the diagnosis on her to "make herself look good in court."

In a November 2011 psychiatric evaluation, Mother admitted she had been diagnosed with bipolar disorder. The evaluator said she may be likely to have difficulty with the treating professional and authority, and she may react to a therapist in a hostile or derogatory manner. Mother was advised to seek psychiatric treatment, but she did not.

Psychiatrist Wafaa Farag, M.D. evaluated Mother in January 2013. Dr. Farag testified about the evaluation and two follow-up visits, and the record contains her notes from those sessions. According to Dr. Farag, Mother had paranoid ideation at the evaluation about "CPS plotting against her." Dr. Farag also recounted the goals Mother discussed in the evaluation, which the doctor characterized as unrealistic: enroll in college, open a ministry, apply for several loans, open a big shelter with several support programs, open a modeling agency, open a construction company, get a manager, and go to Hollywood for acting

11

classes. At trial, Dr. Farag explained Mother's statement of her goals was a typical presentation for manic disorder: "[T]he patient will have unrealistic goals doing many things at the same time and would refuse to acknowledge that that's not reality."

Following the evaluation, Dr. Farag diagnosed Mother with bipolar disorder I with grandiose delusions. Mother was again prescribed Invega for daily use, to be increased to a higher dosage for mood stabilization. Dr. Farag's office gave Mother free samples of the medication. Mother asked about bipolar disorder I and II and about the side effects of Invega. She told Dr. Farag, "If it takes my energy away, I will not take it. I want to achieve my goals."

Mother returned two weeks later for a follow-up visit. She was texting with friends during the visit. Dr. Farag described her as "a little bit less" manic than she had been during the evaluation. Mother said she had been taking Invega daily and had tried to increase the dosage, but it made her sleepy. She denied any side effects of the medication and reported having fewer racing thoughts and being less hyper. Mother again expressed her belief that "CPS is against her." Because Mother was still in an elated state, Dr. Farag, with Mother's consent, administered a different form of Invega through an intramuscular injection.

A month later, Mother had her final appointment with Dr. Farag. Mother had come by the office a week earlier to pick up a higher dose of Invega. At the visit, however, she said she did not need the medication, which was preventing her from achieving the goals she listed in the evaluation. Dr. Farag again told her those goals were unrealistic. Mother insisted she did not have bipolar disorder, only anger management problems. She refused to take the medication and said she would take anger management classes instead. Dr. Farag recommended that

Mother be admitted to Santa Maria Hostel for inpatient drug rehabilitation. At trial, Dr. Farag opined that Mother was in her manic phase at that appointment.

Mother testified that, at an unspecified time, she was diagnosed with adjustment disorder and told she did not need to be on medication. She said she was told she could manage the disorder with counseling. Dr. Farag explained how a person can be diagnosed with bipolar disorder and later not appear to have it:

> Q. Have you ever had an experience where someone was diagnosed with bipolar, and then takes another psychological evaluation and they are no longer diagnosed as bipolar?
>
> A. Yes. It can happen if the patient doesn't answer the questions right, they don't give the symptoms of manic disorder. And also bipolar disorder comes in episodes, so a patient can have a manic episode and go almost to normal or go to a depressive disorder.
>
> Q. So if somebody is diagnosed [with] bipolar depression [sic] on one psychiatric evaluation, and then they do not have that diagnosis, would that mean they are no longer bipolar?
>
> A. No. It means they are in between the episode[s], or they might have a depressive episode and present by depression, and they can be misdiagnosed as depression.

Dr. Farag concluded her testimony by noting there is no cure for bipolar disorder and recommending that Mother have a lifetime treatment of psychotropic medication for that condition.

### 3. Criminal activity

Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *In re S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.).

Mother has been charged with at least eight crimes since 1998. Three appear to have been dismissed. She was convicted and jailed for others:

- August 2004: prostitution, 10 days' confinement
- December 2004: forgery of a financial instrument, 180 days' confinement
- February 2009: illegal use of a license or certificate, 30 days' confinement
- November 2010: (during the First Case) escape class C warrant; arrested in July 2012
- September 2014: (during these cases) failure to stop and give information; disposition not apparent from record

The September 2014 charge stemmed from a car accident between Mother and another driver. Oscar, who had been returned to Mother several months earlier, was in the car with her while she drove. She said she left the scene of the accident for approximately 10 minutes so she could go for help and call 911. When asked why she did not send Oscar to get help, she said, "I wasn't thinking. The only thing I was thinking was we need to go get help. We need to go get help. That's what came to my mind." As a result of that charge, Oscar was again removed from Mother's home. Oscar later said he believed Mother was "on something," either drugs or alcohol, while she was driving. According to him, she "crashed, got out of the car, and took off," leaving him at the scene.

In August 2013, while these cases were pending, Mother placed an advertisement on an adult website. Caseworker Marsha Harris testified that the website on which Mother's ad appeared "has been known to be a front for prostitution." No criminal charges have been brought against Mother regarding that ad.

The ad included four photographs of Mother in lingerie. She called herself "Sexy K." The headline for her ad reads: "BEST OF DA BEST, infinite pleasure, MY TALENTS ARE ENDLESS." The body of the ad reads:

My talents speak for their self!
My skills are impeccable
And pleasing just comes easy. . . So get in touch!!!
The ad says Sexy K is available day and night.

At trial, Mother said she was advertising herself as a model. She said "talents" referred to her modeling talent, and "skills" referred to her modeling skills. "Infinite pleasure" referred to "[t]he infinite pleasure of having fun with them and sitting around with them and enjoying the day with them while you're eating and talking." She said she could be available at night because her children were in the Department's custody at that time.

### Conclusion on Endangerment Finding

Reviewing all the evidence in the light most favorable to the termination finding under subsection E, we conclude a reasonable factfinder could have formed a firm belief or conviction as to the truth of the finding that Mother engaged in endangering conduct. *See In re J.O.A.*, 283 S.W.3d at 344. In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of that termination finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of that finding. *See In re H.R.M.*, 209 S.W.3d at 108. As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of Mother's self-serving testimony. *See In re S.A.H.*, 420 S.W.3d 911, 927 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We hold the evidence is legally and

factually sufficient to support the predicate termination finding under subsection E. We overrule Mother's first issue.

Because we hold the evidence is factually and legally sufficient to support the finding under subsection E, we do not address Mother's second issue, challenging the sufficiency of the evidence to support the finding under subsection O. *In re A.V.*, 113 S.W.3d at 362 (only one predicate finding under section 161.001(1) is necessary to support decree of termination if termination is also in the best interest of the child).

## BEST INTEREST OF THE CHILD

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(2). We review the entire record in deciding a challenge to the court's best-interest finding. *See In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

### Legal Standards

There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or

proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In addition, the Texas Family Code sets out thirteen factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 263.307(b). Factors applicable to this case include:

1.   the child's age and physical and mental vulnerabilities;

2.   the frequency and nature of out-of-home placements;

3.   the magnitude, frequency, and circumstances of harm to the child;

6.   the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

8.   whether there is a history of substance abuse by the child's family or others who have access to the child's home;

10.  the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

11.  the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and

12.  whether the child's family demonstrates adequate parenting skills, including providing the child with:

     (a)   minimally adequate health and nutritional care;

     (b)   care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

17

(c)    guidance and supervision consistent with the child's safety; and

(f)    an understanding of the child's needs and capabilities; and

13.    whether an adequate social support system consisting of an extended family and friends is available to the child.

*See id.*; *In re R.R.*, 209 S.W.3d at 116.

## Analysis

### 1.    Danger to the children

Evidence supporting termination under one of the grounds listed in section 161.001(1) also can be considered in support of a finding that termination is in the best interest of the children. *See In re S.R.*, 452 S.W.3d at 366-67; *In re C.H.*, 89 S.W.3d at 27. Thus, it is appropriate to consider in our best-interest analysis the evidence recited above relevant to endangerment. Mother's substance abuse, untreated mental illness, and criminal activity support the trial court's best-interest finding. The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re S.R.*, 452 S.W.3d at 367. The trial court reasonably could have considered that Mother would likely continue to use drugs and refuse to accept mental health treatment.

### 2.    Mother's parental abilities

***Potential for taking care of the children.*** Mother participated in an 8-week parenting class and a 4-hour anger management class run by Mona Ellis in the spring of 2012. Ellis described Mother as happy and an active participant in most of the parenting class sessions. Mother gave Ellis advance notice of her absence at the only session she missed, and she made up the session at the end of the course.

Ellis used information Mother provided about herself to run the APPI Parent Skills Assessment. The assessment revealed "medium risk factors" for child abuse in the following areas: expectations, empathy, corporal punishment, and family roles. The assessment revealed "high risk factors" for child abuse and neglect in the areas of power, independence, and empowering children to make good decisions. At trial, Ellis testified:

> [S]he did a parenting assessment that shows she did have the ability to bond and nurture with her children. She pretty much understood child development. The only concern was some of the rearing practices. That is very, very traditional for families in America. She didn't really have a high belief in corporal punishment but basically through power and independence. So we focused on allowing kids to make decisions and choices and things of that sort because a lot of our traditional parenting styles are more autocratic, so we kind of talked more about her freedom than limits.
>
> . . .
>
> No doubt, she really showed love and concern and compassion for her children. We talked about that a lot as a group with several other members. She was very compassionate and very empathetic at times and would cry.

Ellis never met the children or saw their interaction with Mother.

In her report from her January 2013 evaluation of Mother, Dr. Farag wrote about Mother's potential to care for her children:

> If [Mother] remains drug free and compliant with her medications, she might be able to parent her children.
>
> Without the benefit of having repeatedly observed [Mother] interacting with her children, definitive comments regarding [her] current ability to meet her children's specific parenting needs are not possible. However, there are many points to be considered including [her] involvement with men who don't care about their children and her long history of drug use. On the other hand, it seems that [Mother] was never treated for Bipolar Disorder and she was self-medicating

19

with drugs. If she remains compliant with medications, she might have a good chance in remaining sober.

Terrance Scott is a licensed professional counselor who treated Mother for a period of time during these cases. Caseworker Marsha Harris testified regarding Scott's final recommendation, which was that Mother "has the mental capacity to be able to care for her children on a permanent basis with ongoing individual therapy and family therapy."

***Anger problems.*** Harris also testified about a November 2011 visit between Mother and the children at a Department office during which Mother became irate:

> She had an outburst in the office in which she became irate with me in front of the children, so security had to be called to remove her from the office.
>
> . . .
>
> It was an issue that [Oscar] was having in the home, and he had told her about it. She was upset, so she confronted me about it; and I asked her to wait until after the visit so that we could take about it, but she refused. She kept questioning me over and over, and she just got upset and started yelling. She said that — she told the kids that I was evil and I was planting things on them.

As a result of her conduct, as well as her drug use, the trial court suspended Mother's visitation rights in mid-November 2011. From that point until March 2014, Mother was permitted to visit the children once a year, around Christmas.

Mother told Dr. Farag in January 2013 that "she yells and blacks out, slams the door and throws stuff and kicks walls" when she is angry. Dr. Farag explained it is "very typical" of bipolar disorder also to have anger problems.

***Drug use and criminal activity while caring for the children.*** By March 2013, Harris testified, Mother had made significant progress in completing the services required by the family service plan. As a result, the trial court reinstated

Mother's visitation rights and returned Oscar to her care in May 2014. Then, following a status hearing on June 16, 2014, the trial court ordered that the other three children begin extended visits with Mother on the weekends. The visits were to begin Fridays at 1:00 pm and end Sundays at 6:00 pm.

Mother was tested for drugs after the June 16 hearing. A week later, the drug test results revealed Mother had ingested cocaine. As a result, on June 27, the trial court suspended Mother's weekend visits until further notice and ordered that Mother's visits with the children occur at the Department office. Oscar remained in her care until September 2014, when Mother was arrested for leaving the scene of her car accident.

### 3. Mother's willingness to parent

By the beginning of 2015, the children all lived with Vassa Fenix, an acquaintance of Mother. Mother was supposed to have only supervised visits with the children while they were with Fenix. However, sometime in February, Mother arrived at Fenix's house drunk. Fenix had not invited her, and they were not scheduled for a visit that day.

Devon Mitchell was assigned as the caseworker on these cases in March 2015. Mitchell testified Mother was scheduled to have two, hour-long visits per month with her children. Since Mitchell began working on these cases, Mother had missed four of five planned visits. She was more than 30 minutes late to the fifth.

### 4. Desires and needs of the children

None of the children testified at trial. It appears Oscar spoke with the judge after the second day of trial, in March 2015. Mother's attorney requested that a record be made of their meeting. However, the appellate record does not contain a transcript of that meeting.

Shortly after the September 2014 accident, Oscar was placed in Fenix's home. The other three boys were placed with her in January 2015.

*Zachary and Jack.* Fenix said the two younger boys were doing very well. Jack had never said anything about Mother in Fenix's presence. Zachary had not said anything about her to Fenix, but she overheard a conversation between him and Jack in which Zachary said Mother was in jail.

*Xavier.* Xavier did well in Fenix's home. However, in March, Fenix asked that Xavier be placed elsewhere, because he had stolen her cell phone, ordered adult content on her television, and downloaded that content to her phone. During the two and a half months he lived with her, Xavier never spoke to Fenix about Mother and never asked to visit Mother.

Meredith Wallace was the coordinator for Child Advocates, Inc., the agency serving as the children's guardian ad litem. She said Xavier was happy in his new foster home and loved his foster parents. He was having problems in school, but his foster parents were handling the situation. Wallace testified Xavier did not want to live with Mother.

*Oscar.* Oscar also did very well while living with Fenix. He attended school every day and was on the school basketball team. He told her he was "never leaving" her house.

Oscar was reportedly conflicted about his feelings for Mother. Fenix said he would say he loved Mother but did not like "what was going on." He was disappointed when Mother failed to attend his last basketball game of the season. He felt it was his fault he was in the Department's custody, and he said Mother expressly blamed him for it.

Guardian ad litem Wallace echoed Fenix's testimony about Oscar's desires. She said Oscar "wants to return to his mom, but he's kind of fluctuated back and forth on that statement."

Caseworker Mitchell testified about her observation of Mother and Oscar. She said Oscar's being involved with Mother "is not an ideal situation," because Oscar "is motivated by his mother to do not so good things." Mitchell had seen two photos of Oscar published on social media sites—one of him smoking a cigarette and one showing the tattoos he had gotten after these cases began. Mitchell said it would be harmful to Oscar's emotional well-being to be returned to Mother.

Oscar attended the second day of trial, on March 30. The day after that trial, Oscar began exhibiting behavioral problems. He went out in the evening and did not return to Fenix's home until 2:00 am. He defied Fenix's instructions, telling her, "My mom says I don't have to do that."

Soon thereafter, Oscar ran away from Fenix's home. The record contains a handwritten note said to be written by Oscar. Corrected for spelling and punctuation, it reads:

> Aunt Vassa, look, I'm so tired of my momma. She thinks everything is my fault. Well, look, she'll never see me again. I'm leaving. I'm sorry. It's getting to me. [I don't know] what to do, so, look, I'm going. Everything is my fault, huh. I know it is but I'm just tired of it.

Oscar reportedly called Mother once after he ran away but would not tell her where he was. He had not returned or been located by the final day of trial.

### Conclusion on Best Interest Finding

Considering all the evidence, as we are charged to do in a best-interest evidentiary review, we conclude the trial court could reasonably have found termination was in the children's best interest. We overrule Mother's third issue.

23

**CONCLUSION**

Having overruled appellant's issues, we affirm the trial court's judgment.


/s/    J. Brett Busby
       Justice


Panel consists of Justices Boyce, Busby, and Brown.